UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHARLES V. FARNSWORTH,

                 Plaintiff,

    v.

TEDDI ARMSTRONG, *et al*.,

                 Defendants.

Case No. C20-5007-MJP-MLP

REPORT AND RECOMMENDATION

## I.     INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Charles Farnsworth is a state prisoner who is currently confined at the Stafford Creek Corrections Center in Aberdeen, Washington. Plaintiff's claims arise out of events that occurred at the Washington State Penitentiary ("WSP") in 2019. In particular, Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments when they denied him access to bupropion and diazepam, medications that were previously prescribed to treat Plaintiff's various mental health issues and an irregular heartbeat, but which Defendants refused to re-prescribe after Plaintiff voluntarily withdrew from all medications and then asked to have them reinstated. (*See*

REPORT AND RECOMMENDATION
PAGE - 1

Am. Compl. (dkt. # 42) at 5-6, 16-19.) Plaintiff also alleges that Defendants retaliated against him for pursuing his administrative remedies with respect to the events which gave rise to this action. (*See id*. at 20; Dkt. # 42-1 at 2-3.) Finally, Plaintiff alleges that Defendants conspired with each other to deprive him of his medications. (Am. Compl. at 16, 19-20.)

Plaintiff identifies the following individuals as Defendants in his complaint: (1) Teddi Armstrong (now Teddi Nee), a psychiatric-mental health nurse practitioner employed at WSP; (2) Jackie Brannan, a licensed practical nurse employed at WSP; and (3) Bruce Gage, M.D., Chief of Psychiatry for the Washington Department of Corrections ("DOC") at times relevant to this action. (*See* Am. Compl. at 3.) Plaintiff seeks damages and injunctive relief. (*Id*. at 10.)

Defendants now move for summary judgment (Defs.' Mot. (dkt. # 89)) and submitted the declarations of Defendants Brannan (Brannan Decl. (dkt. # 90) and Nee (Nee Decl. (dkt. # 91)) in support. Plaintiff filed a brief in opposition to Defendants' motion (Pl.'s Resp. (dkt. # 97)), and Defendants filed a reply, which included a motion to strike portions of Plaintiff's response and a declaration that Plaintiff submitted in support of his response (Defs.' Reply (dkt. # 100)). The Court, having reviewed Plaintiff's amended complaint, Defendants' motion for summary judgment, and the balance of the record, concludes that Defendants' motion (dkt. # 89) should be granted, and that Plaintiff's amended complaint and this action should be dismissed with prejudice.

## II.    BACKGROUND

Plaintiff is a Vietnam War veteran who was injured in combat in 1968. (Am. Compl. at 11, ¶¶ 1-2.) In 1997, he was diagnosed with Post Traumatic Stress Disorder ("PTSD") while in the custody of the U.S. Bureau of Prisons. (*Id*. at ¶ 3.) He was thereafter diagnosed with a host of

1    other mental issues related to his time in combat, including Traumatic Brain Injury, severe

2    depression, anxiety/panic attacks, and hyper-vigilance. (*Id*. at ¶¶ 4-5.) Plaintiff also suffers from

3    heart arrhythmia which can cause severe chest pains. (*See id*.)

4         Prior to his current incarceration, Plaintiff was successfully prescribed bupropion and

5    diazepam to treat his various mental health conditions and his arrythmia. (Am. Compl. at 12,

6    ¶¶ 10-11.) Plaintiff had also previously been prescribed a number of other medications to treat

7    his mental health conditions that were either ineffective or had intolerable side effects. (*Id*. at

8    ¶ 7-8.) According to Plaintiff, the bupropion was prescribed by a Bureau of Prisons psychiatrist

9    while Plaintiff was confined at the Lompoc Federal Correctional Institution in about 2008, and

10   the diazepam was prescribed after Plaintiff's release into the community in about 2009. (*Id*.)

11        When Plaintiff arrived at WSP in 2012, he informed the mental health staff that he had

12   previously been prescribed bupropion and diazepam but was told the DOC only issued such

13   drugs in specific cases and Plaintiff's medical records did not indicate he had been receiving

14   those drugs. (Am. Compl. at 13, ¶¶ 12-13.) Plaintiff thereafter obtained his medical records

15   dating back to 1997 and asked his WSP psychiatrist, Dr. Grubb, to review both his medical

16   records and his military records. (*Id*. at 13-14, ¶¶ 14-15, 20.) Dr. Grubb reviewed Plaintiff's

17   records and then took the information to the Care Review Committee ("CRC") which approved

18   prescriptions for bupropion and diazepam in or around August 2017. (*Id*. at 14, ¶ 21.)

19        On December 7, 2018, Ms. Nee assumed care of Plaintiff's psychiatric needs at WSP

20   after Dr. Grubb left the facility. (Nee Decl. at ¶ 4.) The psychotropic medications Plaintiff was

21

22

23

REPORT AND RECOMMENDATION
PAGE - 3

taking at that time, including diazepam and bupropion SR[1], were continued as prescribed. (*Id*.) Diazepam, otherwise known as Valium, is used to treat anxiety, among other conditions. (*Id*.) It has a risk for abuse and addiction, which can lead to overdose and death. (*Id*.) Bupropion, also known as Wellbutrin, is approved by the U.S. Food and Drug Administration to treat depression and seasonal affective disorder, and to help people stop smoking. (*Id*. at ¶ 5.) It is sometimes prescribed as well to treat other "off-label" conditions such as attention deficit hyperactivity disorder, bipolar disorder, sexual problems, and obesity. (*Id*.) Bupropion is also subject to abuse and diversion in the prison setting. (*Id*.)

On February 19, 2019, Ms. Nee saw Plaintiff while he was confined on close custody at WSP, determined that he was doing well, and continued his prescriptions. (Nee Decl. at ¶ 6.) On April 5, 2019, Plaintiff was promoted from close custody to medium custody at WSP. (*Id*. at ¶ 7.) Plaintiff claims that at one of his first pill-line medication pick-ups after being transferred to medium custody, Ms. Brannan told him he should not be receiving his medications. (Am. Compl. at 14, ¶ 23.) He further claims that another inmate who was in line behind him at the time of his exchange with Ms. Brannan, Inmate Johnathan Frohe, informed Plaintiff that Ms. Brannan had tried to cause problems with his medication as well when he first arrived in medium custody. (*Id*. at ¶ 24.)

On April 22, 2019, after Plaintiff was promoted to medium custody, Ms. Nee was advised by Nurse Lonna Lobe that staff members had caught Plaintiff cheeking, and possibly selling, his bupropion to other inmates in his housing unit. (Nee Decl. at ¶ 8.) Ms. Nee thereafter ordered

---

[1] Bupropion SR, the formulation originally prescribed for Plaintiff, is a sustained release version of the drug. (Nee Decl. at ¶ 5.)

REPORT AND RECOMMENDATION
PAGE - 4

that Plaintiff's bupropion be crushed and floated in clear liquid, a common method used to make abuse and diversion of medications more difficult. (*Id*.) After ordering this change to the method of delivery for Plaintiff's bupropion, Ms. Nee was contacted by a DOC staff pharmacist and advised that the manufacturer did not recommend crushing and floating the sustained release version of the drug. (*Id*. at ¶ 9.) Ms. Nee therefore changed the formulation of Plaintiff's bupropion prescription from the sustained release version to the immediate release version which can be crushed and floated. (*Id*.)

On May 3, 2019, Ms. Nee met with Plaintiff again, at which time Plaintiff reported he was doing well in medium custody but complained about his medication being crushed.[2] (Nee Decl. at ¶ 10, Ex. 4.) Plaintiff advised Ms. Nee that the non-time release formulation was not as effective as the time release formulation because it did not last as long. (Am. Compl. at 15, ¶¶ 27-28.) Ms. Nee explained that she had been informed by the nursing staff that Plaintiff was caught cheeking his medication and that custody staff had found medication in his cell. (Nee Decl. at ¶ 10.) Ms. Nee subsequently contacted custody staff in Plaintiff's unit and was informed that after nursing staff requested Plaintiff's cell be searched, a significant amount of time passed before they were able to conduct the search and they were not able to locate the purportedly diverted drugs in Plaintiff's cell. (*Id*.)

After learning why his medication was being crushed and floated, Plaintiff became very upset and stated that he wanted to stop all psychiatric medications. (Nee Decl. at ¶ 11, Ex. 4.) Ms. Nee discussed the risks associated with stopping the medications suddenly, and offered to

---

[2] Though Ms. Nee states in her declaration that this appointment occurred on March 5, 2019, the exhibits attached to her declaration make clear the appointment occurred on May 3, 2019. (*See* Nee Decl. at ¶¶ 10-12, Exs. 4-5.)

REPORT AND RECOMMENDATION
PAGE - 5

taper the medications, but Plaintiff told her he wanted to discontinue all medications after verbalizing his understanding of the pros and cons of doing so. (*Id.*) Plaintiff signed a form refusing further psychiatric services, and Ms. Nee discontinued all of Plaintiff's medications which included bupropion, prazosin, trazodone, and diazepam. (*Id.* at ¶ 11, Exs. 4-5.)

Plaintiff claims he knew Ms. Nee's assertion that medications had been found in his cell was untrue, which caused him extreme stress and resulted in him experiencing a "dissociative state" during which he withdrew from all his medications. (Am. Compl. at 16-17, ¶¶ 36-37, 39.) Ms. Nee, on the other hand, states that she did not witness Plaintiff in a dissociative state during the appointment, noting that Plaintiff was able to verbalize his understanding of the choice he was making and to sign the refusal of service form. (Nee Decl. at ¶ 12.)

On July 3, 2019, Ms. Nee saw Plaintiff again after he submitted a kite requesting to be seen by Psychiatric Mental Health Services. (Nee Decl. at ¶ 13, Ex. 6.) Plaintiff reported that he had been struggling a lot and his PTSD had been acting up. (*See id.*) Plaintiff asked that his medications be re-prescribed. (Am. Compl. at 17, ¶ 40.) Ms. Nee ordered that Plaintiff restart his prescription for prazosin to help with his PTSD symptoms but noted that Plaintiff was focused on getting back on his bupropion and diazepam, which were not restarted. (Nee Decl. at ¶ 13, Ex. 6 at 2-3.) In the ensuing days, Ms. Nee reviewed the past fifteen years of Plaintiff's medical records and noted which medications had been tried in the past to address his mental health concerns. (*Id.* at ¶ 14.) This review revealed that though Plaintiff had tried several medications, he had not yet tried certain serotonin reuptake inhibitors ("SSRIs"), nor had he tried tricyclic antidepressants ("TCAs"), both of which were recommended by the DOC's PTSD Protocol as preferred treatment to be tried before drugs like bupropion and diazepam. (*Id.*) Ms. Nee

REPORT AND RECOMMENDATION
PAGE - 6

consulted with Dr. Gage who concurred that the next step in Plaintiff's treatment would be a trial of amitriptyline, a TCA. (*Id*.)

On July 12, 2019, Ms. Nee met with Plaintiff, explained that her review of his records indicated an adequate trial of amitriptyline had not yet been pursued, and offered to start him on that medication. (Nee Decl. at ¶ 16, Ex. 7.) Plaintiff indicated he was not interested in taking the amitriptyline and was focused instead on pursuing bupropion. (*Id*.) Plaintiff asked that his case be reviewed by the DOC's psychiatric CRC to get approval for bupropion. (*Id*.; *see also* Am. Compl. at 17, ¶ 43.) Ms. Nee completed a consultation request form the same day seeking CRC review of Plaintiff's request to restart his bupropion. (Nee Decl. at ¶ 16, Ex. 8.)

On July 25, 2019, Ms. Nee presented Plaintiff's case to the CRC. (Nee Decl. at ¶ 18, Ex. 9.) The CRC voted 6-0 to deny the request for bupropion. (*Id*.) The CRC's report from the meeting reflects that though Ms. Nee presented Plaintiff's case, she abstained from voting. (*See id*.) The report further reflects that Dr. Gage, whom Plaintiff asserts voted not to re-prescribe his bupropion, was not present and did not participate in the meeting. (*See id*.) Plaintiff claims there was no valid reason for the CRC to deny his request. (Am. Compl. at 17, ¶ 43.)

Plaintiff was scheduled to see Ms. Nee again on July 29, 2019, but Plaintiff missed his call-out. (Nee Decl. at ¶ 19.) On the same date, Plaintiff sent three "angrily worded" messages directed toward Ms. Nee via WSP's kiosk machines, a mechanism through which prisoners can send electronic messages to staff. (*Id*., Ex. 10.) In the following days, Plaintiff sent additional kiosk messages pertaining to Ms. Nee that she deemed threatening in nature. (*See id*.) In particular, on July 31, 2019, Plaintiff sent a message indicating he would not speak to Ms. Nee "BECAUSE IM ALREADY TYING TO BEAT ONE LIFE SENTENCE WITHOU (sic) AND

REPORT AND RECOMMENDATION
PAGE - 7

AM TRYING NOT TO PICK UP A 2ND ONE." (*Id.* at ¶ 19, Ex. 10 at 2.) On August 6th or 7th of 2019, Plaintiff sent a message stating "I DONT WANT TO SPEAK WITH ARMSTRONG AS SHE CAUSES ME PPTSD (sic) RELATED COMBAT PROBLEMS. WHO WILL I SPEAK WITH. I CANT BE N CONTROL OF MY ACTIONS SHOUD WE BE IN THE SAME ROOM." (*Id.*)

On August 6, 2019, Plaintiff was transported by ambulance to the emergency room of an outside hospital with "extreme heart and chest pains." (*See* Am. Compl. at 18, ¶ 45; Pl.'s Resp. at 39-44.) Plaintiff was diagnosed with anxiety and atypical chest pain, and was prescribed diazepam for use upon his return to prison.[3] (*See* Am. Compl. at 18, ¶ 47; Pl.'s Resp. at 41.) Plaintiff claims the prison medical staff refused to honor this prescription after he returned to the facility, though he does not implicate any of the named Defendants in the alleged denial of this medication.[4] (Am. Comp. at 18, ¶ 48.)

On August 7, 2019, Ms. Nee completed a DOC Report of Contact detailing her involvement in Plaintiff's care and Plaintiff's threatening behavior. (Nee Decl. at ¶ 21, Ex. 11.) Ms. Nee explained in her report that "[s]hould offender Farnsworth release from [intensive management unit ("IMU")] to medium, protective custody, or close custody units, he would likely still be on my case load. I am concerned for my safety if I continue providing care for him due to the threats he has made (see kiosk messages)." (*See id.*) Ms. Nee attached to her report

---

[3] Plaintiff asserts in his amended complaint that the emergency room physician prescribed diazepam for 14 days. (Am. Compl. at ¶ 47.) However, the notes of Plaintiff's emergency room visit indicate the diazepam was prescribed for use, as needed, for only seven days. (Pl.'s Resp. at 41.)

[4] Plaintiff claims that he asked Ms. Brannan to find out what happened to the prescription and never received a response. (Pl.'s Resp. at 36.) To the extent Plaintiff intends to assert an additional claim for relief in his response, the Court declines to consider it as it was not properly pleaded in Plaintiff's amended complaint.

REPORT AND RECOMMENDATION
PAGE - 8

copies of Plaintiff's kiosk messages. (*See id*.) On September 18, 2019, Plaintiff was transferred to the Clallam Bay Corrections Center after a "keep separate request" involving multiple threats to Ms. Nee's life was approved. (*Id*. at ¶ 22.) The request ensures that Plaintiff and Ms. Nee will be kept separate until at least 2029. (*Id*.)

## III.    DISCUSSION

### A.    Applicable Legal Standards

#### 1.    Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a

REPORT AND RECOMMENDATION
PAGE - 9

1  genuine dispute, or that an adverse party cannot produce admissible evidence to support the

2  fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there

3  is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at

4  585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over

5  facts that might affect the outcome of the suit under the governing law will properly preclude the

6  entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

7  (emphasis in original). The central issue is "whether the evidence presents a sufficient

8  disagreement to require submission to a jury or whether it is so one-sided that one party must

9  prevail as a matter of law." *Id.* at 251-52.

10      The opposing party must present significant and probative evidence to support its claim

11  or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

12  "The mere existence of a scintilla of evidence in support of the non-moving party's position is

13  not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d

14  1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with

15  allegations in the complaint, or with unsupported conjecture or conclusory statements."

16  *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

17          2.    *Section 1983 Standard*

18      To sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show: (1) that he

19  suffered a violation of rights protected by the Constitution or created by federal statute; and (2)

20  that the violation was proximately caused by a person acting under color of state law. *See*

21  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

22  satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

23

REPORT AND RECOMMENDATION
PAGE - 10

another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

**B.    Analysis**

*1.    Eighth Amendment Claims*

Plaintiff alleges that the three named Defendants violated his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. (Am. Compl. at 5.) More specifically, Plaintiff complains that Defendants interfered with and/or denied him access to bupropion and diazepam. (*See id.* at 14-20.) Plaintiff claims that during the two years he was prescribed bupropion and diazepam he reported no mental health issues or heart/chest pains, and he is now experiencing those problems again due to the absence of the drugs. (*Id.* at 18.)

The Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking reasonable measures to guarantee the safety of inmates. *Id.* To establish an Eighth Amendment violation for inadequate medical care, a plaintiff must demonstrate that he had a "serious medical need," and that defendants' response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1991),

REPORT AND RECOMMENDATION
PAGE - 11

*overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

A prison official is deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk to inmate health." *Farmer*, 511 U.S. at 837. To be found liable under the Eighth Amendment, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). An inadvertent or negligent failure to provide adequate medical care is insufficient to establish a claim under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *see also Farmer*, 511 U.S. at 835 ("ordinary lack of due care" is insufficient to establish an Eighth Amendment claim). Differences of opinion between a prisoner and prison medical staff or between medical professionals regarding the proper course of treatment does not give rise to a § 1983 claim. *Toguchi*, 391 F.3d at 1058. "[A] prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Id*. (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

With respect to Ms. Nee, Plaintiff fails to demonstrate that this Defendant was deliberately indifferent to his mental health needs. The evidence demonstrates that Ms. Nee, upon assuming responsibility for Plaintiff's care, continued the medications he had previously

REPORT AND RECOMMENDATION
PAGE - 12

been prescribed, which included bupropion and diazepam. (Nee Decl. at ¶ 4.) The evidence further demonstrates that at no point did Ms. Nee discontinue any of Plaintiff's medications, she merely changed the formulation of one of the medications, the bupropion, as a result of concerns that Plaintiff was misusing it. (*See id*. at ¶¶ 8, 10, Ex. 4.) Specifically, Ms. Nee adopted a common method used to make abuse and diversion of medications more difficult, *i.e.*, crushing and floating the medication in a clear liquid. (*Id*. at ¶ 8.) Plaintiff is adamant in his denials of ever having misused his medications. (Am. Compl. at 15-16, ¶¶ 32-36.) However, Ms. Nee states that she believed Nurse Lobe had accurately reported Plaintiff's misuse of the medications, and that she acted based on that information. (Nee Decl. at ¶ 8.) Though Ms. Nee later learned that custody staff were not able to locate any diverted drugs in Plaintiff's cell, that does not render her initial actions in changing the formulation violative of the Eighth Amendment.

Moreover, nothing in the record demonstrates that changing the formulation of Plaintiff's medication exposed him to a serious risk of harm. Though it was evidently not Plaintiff's preferred formulation, and Plaintiff did not think it as effective as the original formulation, there is no evidence that the change in formulation caused his symptoms to escalate in any appreciable way. It cannot be overlooked that it was Plaintiff's own response to the change in formulations, *i.e.*, choosing to go off his medications completely, that apparently led to the re-emergence of symptoms that Plaintiff claims were effectively managed while he was on bupropion and diazepam. To the extent Plaintiff attempts to claim that he was in a dissociative state when he opted to curtail his medications, inferring that he should not be held responsible for the decision, the evidence in the record refutes that claim. Plaintiff verbalized to Ms. Nee his understanding of the risks associated with terminating his medications and voluntarily signed a waiver consenting

REPORT AND RECOMMENDATION
PAGE - 13

to the termination of psychiatric services. (Nee Decl. at ¶ 12.) Ms. Nee cannot be held responsible for Plaintiff's voluntary choice to terminate his medications.

With respect to Ms. Nee's alleged refusal to re-prescribe Plaintiff's bupropion and diazepam, the record likewise evidences no deliberate indifference. When Plaintiff reached out to mental health to indicate that he was struggling without his medications, Ms. Nee offered to start Plaintiff on a different medication that he had not previously tried, and that was recommended by the DOC's PTSD Protocol as a preferred treatment to be tried before drugs such as bupropion and diazepam. (Nee Decl. at ¶¶ 14, 16, Ex. 7.) However, Plaintiff was not interested in taking the offered medication and asked that his case be reviewed by the CRC in order to pursue his preferred medications. (*Id*. at ¶ 16, Ex. 7.) Ms. Nee acceded to Plaintiff's request and submitted a consultation request to the CRC to consider the prescription of psychotropic medication for Plaintiff's PTSD symptoms. While the CRC denied the request, Ms. Nee abstained from voting. It cannot be said that Ms. Nee was deliberately indifferent to Plaintiff's medical needs based on the CRC's denial of Plaintiff's request for psychotropic medications when she did not participate in making the ultimate decision.

Moreover, the fact that Ms. Nee offered an alternate treatment plan, simply not one Plaintiff preferred, undermines Plaintiff's constitutional claim. As noted above, a difference of opinion between a prisoner and the prison medical staff regarding the proper course of treatment does not give rise to an Eighth Amendment claim. Plaintiff offers no evidence that the treatment he was offered, and rejected, was medically unacceptable under the circumstances or that it was chosen in conscious disregard of an excessive risk to Plaintiff's health. Plaintiff's Eighth Amendment claim against Ms. Nee therefore fails.

REPORT AND RECOMMENDATION
PAGE - 14

With respect to Ms. Brannan, the only factual allegation in Plaintiff's amended complaint is that Ms. Brannan commented to Plaintiff during pill-line that he should not be receiving his medications. (Am. Compl. at 14, ¶ 23.) Plaintiff, in his response to Defendants' summary judgment motion, adds to this allegation that Ms. Brannan used "an accusatory and negative tone of voice" when telling him he should not be receiving the drugs he had been prescribed. (Pl.'s Resp. at 24.) Ms. Brannan indicates that she does not recall making such a statement to Plaintiff. (Brannan Decl. at ¶ 2.) However, regardless of whether Ms. Brannan made such a statement and of any tone of voice she may have used in making such a statement, assuming one was made, Plaintiff's allegations are insufficient to demonstrate that Ms. Brannan's actions violated Plaintiff's Eighth Amendment rights.

Plaintiff does not allege that Ms. Brannan refused to give him his medications, only that she expressed her opinion that Plaintiff should not be receiving them. This allegation does not implicate federal constitutional concerns. *See Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (verbal harassment and abuse is not sufficient to state a claim for relief under § 1983). The crux of Plaintiff's claim against Ms. Brannan appears to be that she conspired with Ms. Nee to deprive Plaintiff of his medication. The Court will address Plaintiff's conspiracy claims separately below.

### 2. *Conspiracy Claims*

Plaintiff alleges that all three Defendants conspired to violate his Eighth Amendment rights by depriving him of his medication. (Am. Compl. at 16-20, ¶¶ 38, 56, 59.) To establish liability for a conspiracy in an action brought under § 1983, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Crowe v.*

REPORT AND RECOMMENDATION
PAGE - 15

1   *County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Env'tl. Ctr. v.*

2   *Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999)). "Such an agreement need not be overt,

3   and may be inferred on the basis of circumstantial evidence such as the actions of the

4   defendants." *Id.*

5        Plaintiff's conspiracy claim as to Ms. Brannan and Ms. Nee is based on Plaintiff's

6   speculation that Ms. Brannan's conduct during the pill-line, when she purportedly told Plaintiff

7   he should not be receiving his bupropion and diazepam, is somehow connected to Ms. Nee's

8   decision to change the delivery system of his bupropion. Ms. Brannan denies having conspired

9   with Ms. Nee or anyone else to deprive Plaintiff of his medication, and maintains that she was

10  not involved in reporting Plaintiff's potential diversion of bupropion to Ms. Nee. (Brannan Decl.

11  at ¶ 3.) And, as discussed above, Ms. Nee's decision to change the formulation of Plaintiff's

12  bupropion was based on a report she received from Nurse Lobe. (*See* Nee Decl. at ¶ 8.)

13       Plaintiff offers in support of his conspiracy claim his own declaration and the declaration

14  of his fellow inmate, Johnathan Frohe. (*See* Pl.'s Resp. at 46-54.) Plaintiff states in his

15  declaration that Ms. Brannan accused him of taking prescribed medications that were not

16  required during their pill-line interaction, and that Ms. Brannan became "demonstrably upset"

17  when Plaintiff asked her "where she did her doctoral internship" and told her to "take it up with

18  my provider." (*Id*. at 47, ¶¶ 5-6.) Plaintiff further states that his medication delivery system was

19  changed within days of this interaction. (*Id*. at 48, ¶ 9.) Mr. Frohe, in his declaration, states that

20  he "overheard a conversation between Brannan and another healthcare provider when Brannan

21  said she'd informed Armstrong that Farnsworth had been rude toward her in the pill-line and that

22

23

REPORT AND RECOMMENDATION
PAGE - 16

she had gone to his cell and thought he was cheeking his meds, maybe even selling them." (*Id.* at 54, ¶ 16.)

Plaintiff's "evidence" fails to demonstrate any meeting of the minds between Ms. Brannan and Ms. Nee to violate Plaintiff's Eighth Amendment rights. Even assuming that Ms. Brannan became upset when Plaintiff was disrespectful to her in the pill-line, and that Mr. Frohe overheard the purported conversation between Ms. Brannan and another provider, Ms. Nee's testimony is that she received information regarding Plaintiff's alleged misuse of his medications independently from another source, Nurse Lobe, which she relied upon in making the decision to change the formulation of Plaintiff's bupropion.

Moreover, as discussed above, Plaintiff fails to demonstrate how merely changing the formulation of his bupropion violated his Eighth Amendment rights. Plaintiff does not demonstrate that the decision to change the formulation was made with knowledge that doing so would expose him to a substantial risk of serious harm or, indeed, that he suffered any harm as a direct result of that decision. That Plaintiff subsequently chose to terminate all medications does not suffice to establish that Defendants violated his Eighth Amendment rights.

Plaintiff also asserts in his amended complaint that Dr. Gage conspired with the other Defendants to deprive Plaintiff of his Eighth Amendment rights when he "voted to deny [Plaintiff's] represcription for no valid reason." (Am. Compl. at 19, ¶ 56.) This is an apparent reference to the CRC meeting at which Plaintiff's request to have psychotropic medications re-prescribed to treat his mental health issues was denied. However, the evidence in the record demonstrates that only Ms. Nee was present at that meeting and she abstained from voting. There

REPORT AND RECOMMENDATION
PAGE - 17

can simply be no conspiracy if none of the alleged conspirators participated in the conduct that Plaintiff claims violated his constitutional rights.[5]

### 3.    First Amendment Retaliation

Plaintiff alleges that Ms. Nee voted against re-prescribing his medications in retaliation for him having pursued his administrative remedies pertaining to Ms. Nee's decision to change the formulation of his bupropion. (*See* Am. Compl. at 20; *see also* Pl.'s Resp. at 59, 63-64, 127, 142.) Plaintiff further asserts that because of Defendants' retaliatory actions, he was "manipulated into a PTSD episode," which resulted in an infraction, placement in the IMU, transfer to another facility, and a custody demotion. (Dkt. # 42-1 at 2-3.)

A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate, (2) because of, (3) that prisoner's protected conduct, and that such action, (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). To prevail on a retaliation claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the

---

[5] The Court notes, with respect to Dr. Gage, that in October 2021, Defendants submitted a statement noting the death of Dr. Gage and noting as well that they were unaware of the identity or existence of Dr. Gage's personal representative. (Dkt. # 88.) No motion has been made to substitute a proper party in place of Dr. Gage, and the time to do so has now passed. *See* Fed. R. Civ. P. 25(a). Thus, leaving aside the fact that Plaintiff has alleged no viable claim for relief against Dr. Gage, this action must be dismissed as to Dr. Gage based on the failure to timely substitute a proper party.

REPORT AND RECOMMENDATION
PAGE - 18

1    conduct of which he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court

2    evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

3         With respect to the first part of Plaintiff's retaliation claim, the record makes clear that

4    Ms. Nee did not participate in the CRC vote denying Plaintiff's request that his psychotropic

5    medications be re-prescribed. (Nee Decl. at ¶ 18.) Plaintiff therefore fails to identify any adverse

6    action to support a retaliation claim against Ms. Nee on this basis.

7         The second part of Plaintiff's claim is somewhat confusing. Plaintiff appears to claim that

8    because he filed grievances against Ms. Nee pertaining to her decision to reformulate his

9    bupropion prescription, Ms. Nee intentionally triggered a PTSD episode which ultimately

10   resulted in his transfer to another facility. (*See* dkt. # 42-1 at 2-3.) Plaintiff's reasoning appears to

11   be that if Ms. Nee had not allegedly triggered the PTSD episode, Plaintiff would not have

12   withdrawn from his medications. Had Plaintiff not withdrawn from his medications, he would

13   not have had to request reinstatement of his medications, his request would not have been

14   rejected, he would not have sent Ms. Nee threatening messages, and he would not have been

15   infracted, transferred, and subject to a custody demotion. (*See id.*; Pl.'s Resp. at 17-19.)

16        This portion of Plaintiff's retaliation claim is fatally flawed as well. Leaving aside

17   Plaintiff's unsupported assertion that Ms. Nee knew how to trigger a PTSD episode, the timeline

18   of events Plaintiff relies upon to support his claim makes little sense. Plaintiff claims that his

19   grievances against Ms. Nee caused her to trigger a PTSD episode, which caused him to withdraw

20   from his medications. However, at the time Plaintiff claims Ms. Nee allegedly triggered the

21   PTSD episode, he had yet to file any grievances against her. The evidence demonstrates that

22   Plaintiff filed his initial grievance against Ms. Nee on May 3, 2019, *after* she informed him at

23

REPORT AND RECOMMENDATION
PAGE - 19

their May 3, 2019 appointment of the reason for her decision to change the formulation of his

bupropion and *after* he made the decision to withdraw from all his medications. (*See* Pl.'s Resp.

at 142; Nee Decl. at ¶ 11, Ex. 4.) Thus, any suggestion that Ms. Nee intentionally triggered a

PTSD episode because of the grievances filed against her, and thereby *caused* Plaintiff to

withdraw from his medications, is absolutely refuted by the record.

Moreover, the record makes clear that infracting and transferring Plaintiff to a different

facility was related to the legitimate correctional goal of ensuring the safety and security of a

WSP employee and, by extension, the safety and security of the facility itself. Plaintiff offers no

evidence to the contrary and his retaliation claim therefore fails. To the extent Plaintiff attempts

to argue that all Defendants conspired to retaliate against him, the claim necessarily fails for the

same reasons discussed above.

4.    *Defendants' Motion to Strike*

Defendants move to strike a portion of Plaintiff's response in which Plaintiff asserts that

Ms. Nee knows how to trigger psychiatric episodes and purposely triggered a PTSD episode in

him. (*See* Defs.' Reply at 1.) Defendants also move to strike portions of Johnathan Frohe's

declaration, which was submitted in support of Plaintiff's response, on the grounds that certain

statements pertaining to Ms. Brannan constitute hearsay. (*Id*. at 2.) Though the Court, in ruling

on Defendants' summary judgment motion, references Plaintiff's allegation that Ms. Nee

triggered a PTSD episode, the Court did not rely on the allegation in any substantive sense and

sees no need to strike it from the record. Likewise, the Court did not rely on Mr. Frohe's

declaration in resolving Defendants' summary judgment motion, and therefore, sees no need to

strike portions thereof. Defendants' motion to strike is therefore denied.

REPORT AND RECOMMENDATION
PAGE - 20

# IV.    CONCLUSION

Based on the foregoing, this Court recommends that Defendants' motion for summary judgment (dkt. # 89) be GRANTED, that Defendants' motion to strike (dkt. # 100) be DENIED, and that Plaintiff's amended complaint (dkt. ## 42, 42-1) and this action be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 15, 2022**.

DATED this 22nd day of March, 2022.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 21